**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **SEVENTEEN THOUSAND NINE HUNDRED DOLLARS ($17,900) IN UNITED STATES CURRENCY**, <br><br> Defendant. | Case No. 15-cv-00368 (CRC) |

<u>**MEMORANDUM OPINION**</u>

This case began with a familiar ethical dilemma:  If you stumble upon a bag of money, do you keep it or turn it in to the police?  An Amtrak passenger's decision to take the more virtuous path led to the government's seizure of the bag's contents—$17,900 in cash—as the alleged fruits of illegal narcotics trafficking.  Two claimants now collectively assert interests in the entire currency.  They have moved to dismiss the government's civil-forfeiture complaint, contending that it fails to plead an adequate connection between the $17,900 and the drug trade.  The government subsequently moved to strike both claims in the currency for lack of standing.  Finding that no reasonable jury could believe the claimants' bizarre explanation for how they came to own the $17,900, the Court will grant the government's motion to strike both claims in their entirety.

     **I.**     **Background**

     A.     <u>Seizure of the $17,900</u>

On March 28, 2014, an Amtrak passenger notified Amtrak police that he had mistakenly removed a backpack belonging to someone else when he dismounted a train at Union Station in Washington, D.C.  Amtrak police found within the backpack a brown shopping bag containing

$17,900 in U.S. currency.  Also inside were "a student notebook, some school papers, multiple electronic device chargers, a shirt, pants, and a cellular telephone."  Govt.'s Ver. Compl. ("Compl.") ¶ 4.  After the backpack was placed in a police roll-call room, a trained narcotics-detection dog alerted to the backpack as a whole.

One of the items in the backpack bore the name "Peter Rodriguez."  After checking the train's manifest, a Metropolitan Police Department ("MPD") officer called the telephone number associated with him.  Peter, having ridden the train the rest of the way to New York City, thoroughly described the backpack's contents but failed to mention the currency.  After being directly asked twice, Peter denied that the backpack contained any money.  He maintained this stance after being informed that a large amount of currency had in fact been found in the backpack, disclaiming "any knowledge of a brown bag or currency."[1]  Id. ¶ 9.  Later that day, a woman named Angela Rodriguez—Peter's mother, and a New York City resident—contacted the MPD to recover the full amount of the $17,900, which she insisted belonged to her and her domestic partner, Joyce Copeland.  The MPD nonetheless seized the currency, which remained in the custody of its Asset Forfeiture Unit.

    B.    Summary of Proceedings

Dubious of Ms. Rodriguez's claim, the federal Drug Enforcement Agency ("DEA") initiated an administrative process to effect the currency's forfeiture to the United States.  The DEA contended that the $17,900 was forfeitable under 21 U.S.C. § 881 because it constituted "money . . . intended to be furnished by a person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys . . . used or intended to be used to facilitate a

---

[1] For a better-known account of three successive denials by a man named Peter, see John 18:13–27.

violation of [the Controlled Substances Act,] 21 U.S.C. § 801 et seq." Compl. ¶ 19.  Ms.

Rodriguez and Ms. Copeland ("Claimants") filed timely claims of interest in the currency—Ms.

Rodriguez for $8,900, and Ms. Copeland for $9,000.

A criminal-background check revealed that Peter Rodriguez was arrested in New York on

April 23, 2014—less than one month after his Amtrak trip—for criminal sale of a controlled

substance in the third degree.  (He was convicted later that year.)  He had also been convicted of

a controlled-substance offense in Virginia state court in May 2007.  Claimant Joyce Copeland

has been convicted of thirteen such offenses, including New York convictions dating to 1989,

1991, 2000, and 2002.  After considering all of the circumstances surrounding the currency's

seizure and the above convictions, the DEA declined to relinquish the currency to Ms. Rodriguez

and Ms. Copeland; it remains in DEA custody.

The matter arrived in this Court when the United States (here, the Plaintiff) filed its

Verified Complaint for Forfeiture *in rem* against the $17,900 in U.S. currency (the Defendant) in

March 2015.  Both Claimants—and no one else—later filed verified claims in the property, in

the amounts listed above.  See ECF Nos. 15–16.  As third-party intervenors, they then moved to

dismiss the government's Complaint, arguing that it failed to allege a theory of forfeitability that

was "more than merely possible or conceivable."  Mem. Supp. Claimants' Mot. Dismiss 1.  This

motion is fully briefed and awaiting decision.

In the midst of briefing on Claimants' motion to dismiss, the government served a set of

Special Interrogatories on each Claimant in order to elucidate their "identity and relationship to

the defendant property."  Supplemental Rules for Admiralty or Maritime Claims and Asset

Forfeiture Actions ("Supp. R.") G(6)(a).  Shortly after receiving Claimants' responses, the

government moved to strike their claims for lack of standing under Supplemental Rule

G(8)(c)(i)(B).  In short, the government asserts that Claimants are "true strangers to the events giving rise to the forfeiture" and have demonstrated no "colorable interest" in the seized currency.  Govt.'s Reply Supp. Mot. Strike 2.  Claimants must first demonstrate their standing before the Court may rule on their motion to dismiss.  Supp. R. G(8)(c)(ii)(A).  The Court held a hearing on both motions on July 18, 2016.

C.     Claimants' Theory of Ownership

Claimants have had two opportunities to substantiate their claims of ownership—in administrative proceedings before the DEA, and in responding to the government's special interrogatories.  Each Claimant was asked to "[s]tate in detail the circumstances in which [she] acquired [her] ownership interest in the Defendant Currency" and to submit any supporting documentation.  Claimant Copeland's Resp. Special Interrogs. ("Copeland Resp."), ECF No. 27-3, at 7, 10; Claimant Rodriguez's Resp. Special Interrogs. ("Rodriguez Resp."), ECF No. 27-4, at 7, 10.  Their most recent effort was assisted by *pro bono* counsel from a Washington, D.C. law firm.[2]  Ms. Rodriguez and Ms. Copeland proffer a convoluted narrative that they insist accounts for all of the $17,900, with Ms. Rodriguez specifically claiming $8,900 and Ms. Copeland $9,000.

Claimants allege that they had been planning for some time to move to North Carolina from New York.  In late 2012, they began pooling their money in order to purchase a used car so that both would be able to drive after they relocated to North Carolina.  Because they "wanted to keep [the money] as cash," and because Ms. Rodriguez "has no credit card," Claimants stored all of the money saved for this purpose in a locked file cabinet in their shared apartment.  Rodriguez

---

[2]  The Court thanks Kirkland & Ellis LLP for its able *pro bono* assistance in this case.

Resp. 17, 19.  Ms. Copeland claims to have sold a mink coat for $5,000 in cash in July 2013,

Copeland Resp. 8, and to have withdrawn $4,400 of her federal tax refund from her JPMorgan

Chase account on February 11, 2014, id. at 9.  She also asserts that she cashed her January and

February 2014 pay stubs upon receiving them, and has the relevant documentation "in her

custody."  Id. at 10–11; see also Claimants' Opp'n Govt.'s Mot. Strike ("Claimants' Opp'n") 9

("Ms. Copeland . . . cashed her pay checks upon receipt.").  But her interrogatory responses

contain no information about the nature of her employment or the amount of her earnings.  So

Ms. Copeland has specifically accounted for $9,400 in cash to cover her $9,000 claim, leaving a

$400 surplus.

Ms. Rodriguez offered the following explanation for how she came to possess $8,900 in

U.S. currency:  In December 2012, she too sold a mink coat for $5,000 in cash.[3]  Rodriguez

Resp. 8.  She withdrew $800 from her checking account on July 15, 2013, and another $300 on

February 14, 2014.  Id. at 8–9.  To account for the $2,800 shortfall, she claims to have received

well over that amount in cash from Ms. Copeland in exchange for having paid her bills—even

though Ms. Copeland had a bank account, and even though Ms. Rodriguez "ha[d] no credit

card."[4]  Id. at 19.  Ms. Rodriguez alleges that Ms. Copeland gave her "at least $1,700" in cash at

some unspecified point between August 2013 and February 2014, id. at 8, and an unspecified

amount of cash less than $2,148.05 at some point between February 10 and February 15, 2014,

when the women left for North Carolina, id. at 9.  In all, Ms. Rodriguez claims that Ms.

---

[3]  Neither Claimant furnished the government any documentation reflecting that these
transactions took place.

[4]  As mentioned above, Ms. Rodriguez cited her lack of a credit card as one reason why she
"chose to carry cash" rather than deposit her savings in either her checking account or her
money-market account.  Id. at 19.

Copeland gave her "at least $9,000 . . . to put towards their cash savings." Id.  The government argues that because Ms. Copeland substantiated her possession of only $400 in cash above the $9,000 she claims, Claimants' interrogatory responses—which rest in part on substantial cash transfers between Ms. Copeland and Ms. Rodriguez—"leave a deficit of at least $2,400 in cash unaccounted for."  Govt.'s Reply Supp. Mot. Strike 6.

In any event, on January 14, 2014, Ms. Rodriguez underwent a pre-operation evaluation for a surgery scheduled to occur "sometime in March 2014."  Rodriguez's Resp. 19.  Claimants say they left New York City for North Carolina on February 15, 2014, intending to purchase a used car and search for housing.  They brought all of their cash savings that had been earmarked for the move—"more than $17,900," some of which was spent during the trip.  Id.  They drove the entire distance without stopping overnight and stayed with Ms. Rodriguez's son Peter in Charlotte for the duration of their visit.  Claimants visited several open houses while in North Carolina, but they did not establish ties, or maintain documentation of contacts, with any realtors. They paid all expenses in cash; no record of any sort exists to confirm that Claimants traveled to North Carolina in February 2014.

Ms. Rodriguez called her doctor's office on February 26, 2014 to learn the date of her scheduled surgical procedure.  After receiving an answer, Claimants insist that they immediately drove back to New York City (again, without stopping overnight).  Ms. Rodriguez left a brown shopping bag containing $17,900 in Peter's apartment—specifically, in his backpack[5]—because

---

[5]  The government's Verified Complaint alleges that "[i]n subsequent communications with the Government, Ms. Rodriguez and Ms. Copeland stated that they . . . left the $17,900 in Mr. Rodriguez's backpack without his knowledge."  Compl. ¶ 6.  This assertion is not hearsay because it constitutes an opposing-party statement under Rule 801(d)(2) of the Federal Rules of Evidence.  The Court may therefore consider it at the summary-judgment stage.

"she intended to return to North Carolina within a short period of time to continue the search for housing and a car."  Id. at 18.  She claims not to have told Peter about the money because she "believed Peter might have taken some of it had he known it was in the bag."  Copeland Resp. 14.  On their return trip, Claimants again paid for food and gas using cash, and again kept no receipts.  Ms. Rodriguez underwent surgery after returning to New York, rendering her unable to return for the currency soon afterwards.  When Peter informed his mother that he would visit her in New York, she asked him to bring the bag she had left behind "but did not tell him that it contained currency."  Compl. ¶ 4.  It was on Peter's March 28 Amtrak journey from North Carolina to New York that a fellow passenger mistakenly removed his backpack, leading to the seizure of the Defendant currency.

## II.     Legal Standards

### A.  Summary Judgment

Before trial in any forfeiture action brought *in rem* under a federal statute, the government "may move to strike a claim . . . because the claimant lacks standing."  Supp. R. G(8)(c)(i)(B).  Such a challenge "may be presented . . . as a motion to determine after hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence."  Id. G(8)(c)(ii)(B).  The Court will apply the summary-judgment standard in this case.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only if a reasonable factfinder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Laningham v. U.S. Dep't of Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

To overcome a motion for summary judgment, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).  A party alleging facts that it claims cannot be genuinely disputed "must support the assertion by . . . citing to particular parts of materials in the record," including depositions, affidavits, and interrogatory responses.  Fed. R. Civ. P. 56(c)(1)(A).  The D.C. Circuit has specifically held that a verified complaint must be treated as an affidavit for purposes of deciding a motion for summary judgment.  Neal v. Kelly, 963 F.2d 453, 457 (D.C. Cir. 1992).  In short, the non-moving party must "provide evidence that would permit a reasonable jury to find in [its] favor"; "mere unsupported allegations or denials" will not do.  United States v. All Assets Held at Bank Julius Baer & Co., 959 F. Supp. 2d 81, 94 (D.D.C. 2013).

In deciding a motion for summary judgment, courts must generally "view the facts and draw reasonable inferences 'in the light most favorable to the [non-moving] party.'" Scott v. Harris, 550 U.S. 372, 378 (2007) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  This posture also requires that courts "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  But when "no reasonable jury could believe" a party's factual allegations (for example, if they are "utterly discredited by the record"), a court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott, 550 U.S at 380; see also United States v. $8,440,190.00 in U.S. Currency, 719 F.3d 49, 59 (1st Cir. 2013) (refusing to credit a factual assertion—even one in a claimant's affidavit—that was "contradicted by common sense"); Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) (explaining that at the summary-judgment stage, courts may disregard "inherently incredible" factual allegations)

8

(internal quotation marks omitted); <u>Lombardo v. Alhambra Police Dep't</u>, No. Civ. 15-6262-JLS (AFM), 2015 WL 9906167, at *4 (C.D. Cal. Dec. 15, 2015) (same, when factual allegations are "so implausible as to defy reality").

### B.   General Standing Principles in Civil-Forfeiture Cases

When the government moves to strike a third party's claim to the defendant property for lack of standing, it is the claimant's burden to "establish[] standing by a preponderance of the evidence."  Rule G(8)(c)(ii)(B).  A claimant must demonstrate both constitutional and statutory standing in order to prevail.  <u>United States v. Sum of $70,990,605</u>, 305 F.R.D. 20, 23 (D.D.C. 2015).

A claimant enjoys constitutional standing if she "has a sufficient interest in the property to satisfy the case-or-controversy requirement of Article III of the Constitution."  <u>Id.</u> (quoting Stefan D. Cassella, <u>Asset Forfeiture in the United States: A Treatise on Forfeiture Law</u> § 9–4, at 326 (2006)).  This requirement is satisfied by demonstrating "a colorable interest in the property, for example, by showing actual possession, control, title, or financial stake."  <u>United States v. Sum of $309,500,000</u>, 85 F. Supp. 3d 111, 116 (D.D.C. 2015) (quoting <u>United States v. Real Property Located at 475 Martin Lane</u>, 545 F.3d 1134, 1140 (9th Cir. 2008)).  It is widely accepted that "an owner of property seized in a forfeiture action will normally have standing to challenge the forfeiture."  <u>United States v. Any and All Funds on Deposit in Account Number XXXXX-XXXXXXXX</u>, 87 F. Supp. 3d 163, 166 (D.D.C. 2015) (quoting <u>United States v. Cambio Exacto, S.A.</u>, 166 F.3d 522, 527 (2d Cir. 1999)).  At the motion-to-strike stage, courts must not resolve whether a claimant's ownership is "legitimate"—unconnected with illegal activity—which would conflate the Article III inquiry with the later merits determination of forefeitability.  <u>United States v. Funds in the Amount of $239,400</u>, 395 F.3d 639, 646 (7th Cir.

2015).

"To establish statutory standing in a forfeiture case," a claimant need only "comply with the procedural requirements set forth" in relevant statutes and rules.  United States v. $487,825.00 in U.S. Currency, 484 F.3d 662, 664 (3d Cir. 2007).  Anyone seeking to assert an interest in the defendant property "may contest the forfeiture by filing a claim in the court where the action is pending."  Rule G(5)(a)(i).  Most notably, such a claim must "identify the specific property claimed," "identify the claimant and state the claimant's interest in the property," and "be signed by the claimant under penalty of perjury."  Id. 5(a)(i)(A)–(C).  "[W]hether [a claimant] is an 'owner' is not germane to the issue of whether it has statutory standing to contest the forfeiture," United States v. Assets Described in "Attachment A" to the Ver. Compl. of Forfeiture in Rem, 799 F. Supp. 2d 1319, 1323 (M.D. Fla. 2011), for even a "bald assertion of interest" would comply with the relevant requirement of Rule G(5), $239,400, 795 F.3d at 644 (quoting United States v. $196,969 in U.S. Currency, 719 F.3d 644, 646 (7th Cir. 2013)).  The government does not dispute that Claimants' Verified Claims of October 5, 2015, see ECF Nos. 15–16, satisfy all relevant procedural requirements.  Their statutory standing is therefore taken as established for purposes of the motion to strike.[6]

Constitutional standing serves a "truly threshold" purpose in civil-forfeiture actions.  All Assets Held, 959 F. Supp. 2d at 96 (quoting United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 79 (2d Cir. 2002)).  This initial burden is "not rigorous," id. at 95 (quoting

---

[6]  The government maintains that establishing statutory standing here would require Plaintiffs to demonstrate actual ownership of the currency.  Govt.'s Mot. Strike 6.  The Court rejects this view as conceptually unsound and needlessly duplicative of constitutional-standing principles. The procedural requirements identified above are the only pertinent "statutory requirements Congress has imposed for contesting a civil forfeiture action in federal court."  Disner v. United States, 888 F. Supp. 2d 83, 86 (D.D.C. 2012).

United States v. One Lincoln Navigator, 328 F.3d 1011, 1013 (8th Cir. 2003)), and "typically any colorable claim on the defendant property suffices," id. at 96 (quoting $8,440,190.00 in U.S. Currency, 719 F.3d at 57); see also Any and All Funds, 87 F. Supp. 3d at 167 ("[T]he bar to establish standing at the initial stages of a civil forfeiture proceeding is low.").

Yet even though the constitutional-standing requirement is quite forgiving, "a claimant must do more than merely *assert* . . . an [ownership] interest" in the defendant property. United States v. All Assets Held at Bank Julius Baer & Co., 664 F. Supp. 2d at 97, 103 (D.D.C. 2009). It is "common ground" that a claimant must "submit some additional evidence of ownership along with his claim." All Assets Held, 959 F. Supp. 2d at 100 (quoting United States v. $38,570 in U.S. Currency, 950 F.2d 1108, 1112–13 (5th Cir. 1992)). Summary judgment should be denied only where there is "contradictory *evidence*"—not just inconsistent assertions in the non-movant's pleadings—bearing on an issue of material fact. Id. at 104 (quoting United States v. 1998 BMW "I" Convertible, 235 F.3d 397, 400 (8th Cir. 2000)) (emphasis added). And despite the general prohibition on ascertaining credibility at the summary-judgment stage, a claimant's self-serving statements—even if contained in an affidavit or interrogatory response—need not be credited if they "def[y] common sense." $8,440,190.00 in U.S. Currency, 719 F.3d at 59.

### III.     Analysis

For starters, a reasonable jury could conclude from Claimants' interrogatory responses that by February 2014, they came to own enough money—potentially convertible into cash—to cover the full amount of the seized currency. The Court also gives Claimants the benefit of the doubt in accounting for the final $2,400 of the Defendant currency, as far as their narrative goes.

Asked to substantiate each component of her claim,[7] Ms. Copeland insisted that she cashed her

January and February 2014 paychecks as soon as she received them.  Copeland Resp. 11.  The

Court is perplexed by her failure to ascribe dollar amounts to these two pay stubs, given the clear

need for a particularized accounting of all cash-receipt events, Claimants' effort to provide one

in several other respects, and the fact that the pay stubs were "in [Ms. Copeland's] custody"

when she completed her interrogatory responses.  Id. at 10.  The exact size of the remaining

shortfall, moreover, is somewhat obscure.  Ms. Copeland would have needed to earn, net of

taxes, at least $2,400 in those two months, *plus* enough money to cover food, gas, and incidentals

during Claimants' cash-only February 15–26 road trip.  The Court nevertheless finds that a

reasonable jury could conclude that two New York City paychecks—whose existence the

government has not contested—would be large enough to cover any remaining deficit.  The

Court also rejects the government's argument that Claimants lack standing because they have not

proved a valid bailment agreement with Peter Rodriguez.  See Govt.'s Mot. Strike 14–16.  That

is certainly not *their* theory of standing; they simply argue that the property was always theirs,

having never been abandoned, and they asked someone to perform an act that would result in

their being reunited with it.

     Claimants' larger problem is that their labyrinthine chronology simply defies common

sense.  It goes without saying that the co-occurrence of several exceedingly unlikely events is

_____

[7]  The full text of the Government's Special Interrogatory No. 5 is as follows: "State in detail the
circumstances in which you acquired your ownership interest in the Defendant Currency,
including but not limited to, the following: 1) the date(s), time(s), and place(s) in which you
acquired the currency; 2) the reason(s) you acquired the currency; 3) the manner in which the
currency was delivered to your possession; 4) the identity of the person(s) from whom you
acquired the currency; and 5) the identity of all persons who were present when you obtained the
currency."  Id. at 7–8.

even more improbable than any one of those events occurring on its own.  With this truism in mind, the Court finds that no reasonable jury could credit Claimants' proffered basis for their alleged ownership of the Defendant currency.  In so doing, the Court makes no findings as to either Claimant's credibility; it instead holds that their composite story exceeds the bounds of rational acceptance.

For example, Claimants allegedly stored thousands of dollars in cash for months on end despite having access to interest-bearing Citibank and JPMorgan Chase accounts.[8]  Copeland Resp. 9.  Asked why she did not keep this money in the bank, Ms. Rodriguez answered that "she wanted to keep it as cash" and "intended to use cash" to purchase a used car.  Rodriguez Resp. 17, 19.  Claimants' purported bill-paying arrangement is even more improbable.  Ms. Rodriguez is alleged to have paid Ms. Copeland's bills in return for equivalent and immediate cash payments from Ms. Copeland.  See id. at 8–9 (claiming that Ms. Rodriguez received an advance tax refund, paid bills for Ms. Copeland, and was reimbursed all in the span of—at most—four days).  This is so even though Ms. Copeland had an active JPMorgan Chase account, Copeland Resp. 9, and Ms. Rodriguez "ha[d] no credit card," Rodriguez Resp. 19.  The Court has been given no reason to believe that Ms. Copeland was logistically unequipped to pay her bills directly, and it can fathom no other reason for such an arrangement.  Claimants provided no remotely plausible context for this practice when asked to "[s]tate in detail . . . the reason(s) [they] acquired the currency."  Rodriguez Resp. 7.  Nor have they explained—despite multiple

---

[8]  The Court is mindful of Claimants' observation that some lower-income Americans maintain cash because they are effectively shut out of the traditional banking system.  At the time of the relevant events, however, both women maintained bank accounts, at least Ms. Copeland was gainfully employed, and both were wealthy enough to have purchased mink coats that they claim to have re-sold for $5,000 each.

opportunities to do so—why they allegedly paid for twelve days' worth of food, gas, and incidentals using cash alone (with no receipts to show for it). Claimants would have the Court believe that just before returning to New York, they removed some of the brown bag's contents specifically to enable them to cover remaining expenses using cash alone. But why? When one has ready access to banking, buying gas with cash is unnecessarily cumbersome. And they had long been accumulating this very currency for a mission that remained unfulfilled.

Lastly, and most decisively, the Court rejects as outlandish that Claimants would have left a bag containing $17,900 in Peter's backpack—or anywhere else in his apartment—rather than keep it in their protective custody until it could be spent as intended. Under Claimants' telling, they had already demonstrated a desire to keep close tabs on the currency for as long as necessary and a willingness to drive long distances with it. They also "believed Peter might have taken some of it had he known it was in the bag." Copeland Resp. 14. Given that Peter was bound to notice the bag at some point, it is simply unbelievable that Claimants would have chosen to leave it with him rather than personally safeguard its contents. That they "intended to return to North Carolina within a short period of time," Rodriguez Resp. 18, makes no difference. People do not leave their front doors unlocked just because their prized heirlooms will be defenseless for only a few hours.

**IV.    Conclusion**

No further discovery is necessary to resolve the issue of Claimants' standing. Each was given ample opportunity to explain her relationship to the $17,900. Because no reasonable jury could conclude that they owned the Defendant currency, the Court will grant the government's

motion to strike and, accordingly, deny as moot Claimants' motion to dismiss.  A separate Order

accompanies this Memorandum Opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:   August 4, 2016